[Cite as *Simek v. Orthopedic & Neurological Consultants, Inc.*, 2019-Ohio-3901.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Michael J. Simek, M.D., et al., | : | |
| Plaintiffs-Appellants/<br>Cross-Appellees, | : | |
| | : | No. 17AP-671 |
| v. | | (C.P.C. No. 15CV-6558) |
| | : | |
| Orthopedic & Neurological<br>Consultants, Inc., et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees/<br>Cross-Appellants. | : | |
| | : | |

## D E C I S I O N

### Rendered on September 26, 2019

**On brief:** *Vorys, Sater, Seymour and Pease LLP, Gary J. Saalman,* and *Damien C. Kitte,* for appellants/cross-appellees. **Argued:** *Gary J. Saalman.*

**On brief:** *Ice Miller LLP, James E. Davidson,* and *Catherine L. Strauss,* for appellees/cross-appellants. **Argued:** *James E. Davidson.*

APPEAL from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Plaintiffs-appellants/cross-appellees, Michael J. Simek, M.D., Scott M. Otis, M.D., and Emily J. Yu, M.D., appeal from a judgment of the Franklin County Court of Common Pleas granting in part the motion for summary judgment of defendants-appellees/cross-appellants, Orthopedic & Neurological Consultants, Inc. ("the medical corporation"), Orthopedic & Neurological Associates ("the real estate partnership"), Carl Berasi, D.O., Mark E. Gittins, D.O., Gregory A. Mavian, D.O., Daryl R. Sybert, D.O., Michael B. Cannone, D.O., Larry T. Todd, D.O., Desmond J. Strutzman, D.O., Jeffrey E. Gittins,

D.O., Martin Taylor, D.O., Donald Rohl, D.O., Ying Chen, D.O., Robert J. Nowinski, D.O., and Jeremy Mathis, D.O. (the non-entity defendants collectively, "individual defendants"). For the reasons which follow, we reverse in part and affirm in part the judgment of the trial court.

## I. Facts and Procedural History

{¶ 2} On July 30, 2015, Drs. Simek and Otis filed a complaint against defendants asserting claims for breach of contract, breach of fiduciary duty, unjust enrichment, conversion, and spoliation of evidence. On May 13, 2016, plaintiffs filed an amended complaint adding Dr. Yu as a plaintiff.

{¶ 3} Plaintiffs are physicians who specialize in physical medicine and rehabilitation ("PM&R"). The individual defendants are osteopathic physicians. Plaintiffs are former shareholders of the medical corporation and current partners in the real estate partnership. The individual defendants are both current shareholders of the medical corporation and current partners in the real estate partnership.

{¶ 4} Plaintiffs were initially employed as physicians in the medical corporation before becoming shareholders. When plaintiffs became shareholders, they executed employment agreements defining the terms of their compensation. Essentially, plaintiffs' compensation as shareholder-physicians was equal to their net receipts for professional services minus charges for overhead. When plaintiffs became shareholders in the medical corporation, they were offered the opportunity to purchase an interest in the real estate partnership. Each plaintiff took advantage of this opportunity.

{¶ 5} Shareholders of the medical corporation formed the real estate partnership in 1981 to own, hold, and develop medical office buildings. (Am. Compl. Ex. A, Partnership Agreement (hereafter "Partnership Agreement"), Section 2.) Historically, only shareholders of the medical corporation could become partners in the real estate partnership. The real estate partnership owned the following medical office buildings: 1313 Olentangy River Road in Columbus, Ohio ("Olentangy"); 70 South Cleveland Avenue in Westerville, Ohio ("Westerville"); and 4420 Refugee Road in Columbus, Ohio.

{¶ 6} The real estate partnership leased space in each building to the medical corporation. Dr. Berasi, the medical corporation's president, explained that the real estate partnership had "delegated to [the medical corporation] some of the management for those

buildings." (Apr. 18, 2016 Berasi Dep. at 23.) Dr. M. Gittins, head of the medical corporation's finance committee, affirmed that the finance committee for the medical corporation also served as the finance committee for the real estate partnership. (M. Gittins Dep. 32-33.)

{¶ 7} The real estate partnership also owned a 28 percent interest in a building known as Medical Office Building 2 ("MOB2") located in New Albany, Ohio. (Simek Dep. Ex. 18; Steffen Dep. at 124.) The other owners of MOB2 included some of the individual defendants and Equity, a real estate company. (Simek Dep. at 47; Apr. 18, 2016 Berasi Dep. at 106.) The medical corporation leased office space in MOB2.

{¶ 8} Another tenant in MOB2 was an ambulatory surgical center ("ASC") known as the New Albany Surgical Center ("NASC"). A number of the individual defendants were owner/investors in NASC.[1] Drs. Simek and Yu attempted to become owner/investors in NASC when the entity was formed. However, Dr. Berasi informed them that they could not join the entity because the other investors "wanted only to have surgeons as partners" in NASC. (Simek Dep. at 167.)

{¶ 9} In February 2006, the medical corporation created a pain procedure suite in its New Albany office. Prior to the creation of the pain procedure suite, the PM&R physicians would perform spine injections at local area hospitals. The pain procedure suite allowed the PM&R physicians to perform spine injections in the medical corporation's offices.

{¶ 10} Plaintiffs explained that they were compensated at a higher rate for performing injections in the pain procedure suite, versus when they performed the same injection at a hospital or an ASC, because procedures performed in the pain procedure suite were considered office-based procedures. (Simek Dep. at 108-09, 126; Yu Dep. at 41-42.) Dr. Otis noted that third-party payors, such as Medicare, compensated office-based procedures at a higher rate to try to "influence point of service." (Otis Dep. at 149.)

{¶ 11} Dr. Berasi, however, stated that the physician's fee for a particular injection was the same regardless of whether the physician performed the procedure in a hospital or

---

[1] The original owner/investors of NASC were Drs. Cannone, Chen, Duffey, J. Gittins, M. Gittins, Nowinski, Rohl, Stutzman, and Todd, as well as the Sybert Family 2007, LLC. (M. Gittins Dep. Ex. 1.) Dr. Berasi became an owner/investor in NASC in 2015. (Apr. 18, 2016 Berasi Dep. at 111.)

in a regular exam room. Dr. Berasi stated that what the third-party payors paid more for was the "facility fee that goes beyond the physician's injection" when the procedure was performed in a hospital or an ASC. (Apr. 18, 2016 Berasi Dep. at 58.)

{¶ 12} After he became president of the medical corporation in 2012, Dr. Berasi directed the medical corporation's CEO, Chris Masciola, to perform an analysis of the pain procedure suite. Masciola emailed his findings to Dr. Berasi in early 2014. Masciola found that the pain procedure suite had yearly expenses of roughly $492,000 and yearly revenue of roughly $1.8 million. Masciola indicated that, while the revenue from the pain procedure suite was split among the PM&R physicians, the expenses were split among all of the shareholders, "resulting in a net loss for most of the physicians." (Yu Dep. Ex. 7.) Masciola proposed alternative possible compensation formulas for the pain procedure suite.

{¶ 13} At a February 25, 2014 medical corporation board meeting, Dr. Berasi made a motion to change the compensation structure for procedures performed in the pain procedure suite to a revenue split model. Under the revenue split model, the revenue from the pain procedure suite would be split into a professional component and a facility component at a 55 to 45 percent ratio. (Yu Dep. Ex. 7.) Thus, the medical corporation would take 45 percent of the net receipts the PM&R physicians earned in the pain procedure suite, and the remaining 55 percent of their net receipts would be subject to the medical corporation's general overhead formula. (Simek Dep. at 134.) Dr. Cannone moved to table the vote on the revenue split model until the March 25, 2014 board meeting.

{¶ 14} Between the February and March board meetings, plaintiffs attempted to generate counter proposals to Dr. Berasi's revenue split model. Although plaintiffs requested a variety of financial information from the medical corporation's controller, Gene Steffen, and from Masciola, plaintiffs "were not allowed to have those numbers." (Otis Dep. at 155.)

{¶ 15} The revenue split model passed by an 11 to 5 vote at the March 25, 2014 board meeting. Under the new compensation structure, it was financially more advantageous for plaintiffs to revert to employed-physician status rather than remain as shareholder-physicians. (Simek Dep. at 190-91; Otis Dep. at 70; Yu Dep. at 160.)

{¶ 16} Once Dr. Berasi received confirmation that plaintiffs wanted to revert to employed-physician status, Dr. Berasi directed the medical corporation's attorney to

prepare three contracts for each plaintiff to sign: a stock purchase agreement to buy back plaintiffs' shares in the medical corporation, a purchase of partnership interest agreement ("PPIA") to buy back plaintiffs' interest in the real estate partnership, and a new employment contract for plaintiffs as employed-physicians. (Apr. 18, 2016 Berasi Dep. at 212-13.)

{¶ 17} Between late March and April 2014, Dr. Berasi directed Steffen and Masciola to calculate the purchase price for plaintiffs' partnership interests, and instructed them to run their calculations by Plante Moran, the medical corporation's accountant. (Steffen Dep. Exs. 11 & 15; Masciola Dep. Exs. 14 & 15; Sybert Dep. Ex. 6.) On April 26, 2014, Dr. Berasi instructed Masciola to ask Plante Moran for "suggestion[s] that [could] improve the corp's position" in the partnership buy-out. (Masciola Dep. Ex. 14.)

{¶ 18} In June 2013, three partners withdrew from the real estate partnership, and Steffen calculated the purchase price for their partnership interests. Steffen used the same formula he used in the 2013 buy-outs to calculate the purchase price for plaintiffs' partnership interests in 2014. (Steffen Dep. at 115-16.) The Olentangy and Westerville properties were appraised in 2013,[2] and Steffen used the 2013 appraised values for those buildings to calculate the 2014 partnership buy-out price. (Steffen Dep. at 146-47; M. Gittins Dep. at 160-61.)

{¶ 19} On April 29, 2014, Steffen sent an email to several of the medical corporation physicians, informing them that the medical corporation had received "the latest payment for Meanigful Use," and that the amount was $11,760 per physician. (Steffen Dep. Ex. 54.) Meaningful use was a Medicare program designed to encourage medical practices to adopt and utilize electronic medical records. (Masciola Dep. at 163.) Under the program, Medicare made yearly payments to medical practices when physicians in the practice attested to using electronic medical records. Although the check from Medicare was written to the medical corporation, "it list[ed] the individual physicians that qualif[ied] for the incentive." (Masciola Dep. at 164.) The medical corporation received a meaningful use

---

[2] Olentangy was appraised at $2.9 million and Westerville was appraised at $2.3 million in 2013. (Sybert Dep. Ex. 6.)

payment in 2013, and those funds were given directly on a pro-rata basis to the physicians who participated in the program.

{¶ 20} Dr. Berasi informed Steffen that he had "overstepped [his] perceived authority" by sending the April 29, 2014 email, as the decision regarding the meaningful use funds was "a finance decision or Board decision." (Steffen Dep. Ex. 54.) The finance committee ultimately voted to retain the 2014 meaningful use funds.

{¶ 21} On the morning of May 1, 2014, Masciola sent Dr. Berasi an email containing the final draft of the PPIA. The purchase price for plaintiffs' respective partnership interests stated in the PPIA was $171,579. Dr. Berasi responded to Masciola's email stating, "[r]eviewed the numbers and contract. It looks good. * * * Please go ahead and offer to secure their signatures." (Masciola Dep. Ex. 8.)

{¶ 22} Masciola presented the contracts to plaintiffs on May 1, 2014. Plaintiffs signed the contracts, and returned the documents to Masciola. On May 7, 2014, Masciola sent plaintiffs an email informing them that Dr. Berasi had counter-signed their employment agreements, stock purchase agreements, and PPIAs. Masciola further informed plaintiffs that he had been "tasked with obtaining the other twelve signatures over the next couple of weeks" on the PPIAs and stock purchase agreements. (Masciola Dep. Ex. 10.)

{¶ 23} At some point after the May 7, 2014 email, Dr. Berasi took the contracts back from Masciola. Dr. Berasi stated that he took the contracts back because he believed the buildings were "highly overvalued." (Apr. 18, 2016 Berasi Dep. at 245.) Although Masciola had secured signatures from a couple of the individual defendants, there were "a number that had not signed" the contracts when Dr. Berasi took them back. (Masciola Dep. at 183.)

{¶ 24} Following the change to the pain procedure suite compensation structure, plaintiffs explored the possibility of performing their procedures at an ASC. Plaintiffs looked at different ASCs, and eventually had a meeting with a representative from an ASC known as White Fence. (Otis Dep. at 179; Yu Dep. at 105-06.) At a May 30, 2014 meeting with Dr. Berasi, which Dr. Otis secretly recorded, Dr. Berasi informed the plaintiffs that the reason their PPIAs and stock purchase agreements "were held and pulled when they did was immediately when the White Fence discussion started." (Pls.' Memo. in Opp. to Defs.' Mot. for Summ. Jgmt., Ex. X Otis Aff., Ex. A at 2 (hereafter, "May 30, 2014 Meeting

Transcript").) Dr. Berasi told plaintiffs that they should try to "do every case [they] possibly could here," and that they should "try to do cases at the [N]ASC even if [they] weren't offered a partnership." (May 30, 2014 Meeting Transcript at 18.) Dr. Yu noted that, once the defendants refused to sign the PPIA and "basically told us we couldn't join this particular ASC, [she] realized that the only purpose they had all along was to push us to do procedures in their ASC." (Yu Dep. at 101.)

{¶ 25} On June 4, 2014, Dr. Berasi sent plaintiffs an email stating that the finance committee had voted to proceed with the stock purchase agreements, but had elected not to proceed with the PPIAs. (Simek Dep. Ex. 16.) Dr. Berasi testified that he carried the PPIAs around throughout May and June 2014, and then destroyed the documents. (June 23, 2017 Berasi Dep. at 105.)

{¶ 26} Effective July 1, 2014, the real estate partnership changed the medical corporation's leases for the buildings from "triple net" to "gross" leases. (Steffen Dep. at 178-79.) Under the triple net lease, the medical corporation was responsible for paying the insurance, taxes, and maintenance fees on the buildings. Under the gross lease, the real estate partnership became responsible for paying those expenses. The change to the leases resulted in substantial savings for the medical corporation.

{¶ 27} Plaintiffs all terminated their employment with the medical corporation in 2015. After Dr. Simek terminated his employment, the medical corporation stopped making payments to Dr. Simek pursuant to his stock purchase agreement, based on the medical corporation's contention that Dr. Simek's new employment resulted in a breach of the non-compete clause of his employment agreement. Drs. Otis and Yu received all the funds owed to them under their stock purchase agreements. (Otis Dep. at 172; Yu Dep. at 139.)

{¶ 28} Plaintiffs asserted the following claims in their amended complaint: (1) breach of contract regarding Dr. Simek's stock purchase agreement; (2) breach of contract regarding the PPIA; (3) breach of fiduciary duty in the real estate partnership; (4) breach of fiduciary duty in the medical corporation; (5) conversion of the meaningful use funds; (6) breach of contract regarding the meaningful use funds; (7) unjust enrichment regarding the meaningful use funds; and (8) spoliation of evidence.

{¶ 29} On June 14, 2016, defendants filed an answer to the amended complaint and the medical corporation filed a counterclaim. The medical corporation asserted the following counterclaims: (1) breach of contract against Dr. Simek for violating the non-compete clause of his employment agreement; (2) unjust enrichment against Dr. Simek resulting from the breach of the non-compete clause; (3) unjust enrichment against Dr. Simek resulting from his use of the pain procedure suite; (4) unjust enrichment against Dr. Otis resulting from his use of the pain procedure suite; (5) unjust enrichment against Dr. Yu resulting from her use of the pain procedure suite; (6) fraud against Dr. Otis based on his failure to inform the finance committee of the true nature of the fees charged for services performed in the pain procedure suite; and (7) breach of fiduciary duty against Dr. Otis based on his failure to inform the finance committee of the true nature of the fees charged for services performed in the pain procedure suite.

{¶ 30} On July 8, 2016, plaintiffs filed a motion to compel discovery, asking the court to compel each of the 13 individual defendants to produce responsive business communications from their personal email accounts. Plaintiffs noted that defendants had produced only emails from their work email accounts in response to discovery requests. Defendants filed a memorandum in opposition to plaintiffs' motion to compel on July 22, 2016. Defendants asserted that plaintiffs' discovery request was overly intrusive, but offered to produce responsive emails from Dr. Berasi's personal email account. Defendants supported their offer with affidavits from the other individual defendants stating that, if they used their personal email accounts for business communications, Dr. Berasi was either a recipient or was copied on such email.

{¶ 31} On August 19, 2016, the trial court issued a decision and entry denying plaintiffs' motion to compel. The court noted that it had "no cause to believe that the individual defendants [were] lying," and concluded that "the production of Carl Berasi's e-mails [was] sufficient to satisfy Plaintiffs' need for discovery." (Aug. 19, 2016 Decision & Entry Denying Plaintiffs' Mot. to Compel at 2.)

{¶ 32} On June 19, 2017, plaintiffs filed four separate motions for summary judgment. Plaintiffs filed a motion for summary judgment on their claim for breach of contract regarding the PPIA, and a motion for summary judgment on their claim for unjust enrichment regarding the meaningful use funds. Dr. Simek filed a motion for summary

judgment on the claims unique to him: count one of plaintiffs' amended complaint and counts one and two of the medical corporation's counterclaim. Plaintiffs filed a motion for summary judgment on the medical corporation's remaining counterclaims.

{¶ 33} On June 19, 2017, defendants filed a motion for summary judgment on counts two through eight of plaintiffs' amended complaint. Defendants asserted that plaintiffs' claims for breach of the PPIA and breach of fiduciary duty in the real estate partnership were subject to arbitration pursuant to the parties' Partnership Agreement.

{¶ 34} Plaintiffs filed a memorandum in opposition to defendants' motion for summary judgment on July 10, 2017. Plaintiffs noted that, while their breach of fiduciary duty in the real estate partnership claim was based on defendants' conduct of lowering the rents charged to the medical corporation, new evidence demonstrated an additional breach of defendants' fiduciary duty. Plaintiffs stated that in February 2017 the real estate partnership entered into a contract to sell the Olentangy and Westerville properties to Equity for less than fair market value and with conditions to specifically benefit the medical corporation. Defendants filed memoranda in opposition to plaintiffs' motions for summary judgment on July 10, 2017.

{¶ 35} On August 10, 2017, the trial court issued a decision and entry ruling on the parties' various motions for summary judgment. The court granted defendants' motion for summary judgment on plaintiffs' claims for breach of the PPIA, breach of fiduciary duty in the real estate partnership, spoliation of evidence, and on the claims for conversion, breach of contract, and unjust enrichment relating to the meaningful use funds. The court granted Dr. Simek's motion for summary judgment on count one of plaintiffs' amended complaint and on count two of the medical corporation's counterclaim. The court granted plaintiffs' motion for summary judgment on the medical corporation's counterclaims for fraud and breach of fiduciary duty.

{¶ 36} The court denied defendants' motion for summary judgment on plaintiffs' claim for breach of fiduciary duty in the medical corporation. The court denied Dr. Simek's motion for summary judgment on count one of defendants' counterclaim. The court also denied plaintiffs' motion for summary judgment on defendants' counterclaims asserting that plaintiffs were unjustly enriched by their use of the pain procedure suite.

{¶ 37} On August 25, 2017, plaintiffs filed a motion for certification of the trial court's summary judgment decision as final and appealable pursuant to Civ.R. 54(B). Defendants filed a response in opposition to plaintiffs' motion for certification on September 8, 2017.

{¶ 38} On September 14, 2017, the trial court issued a decision and entry granting plaintiffs' motion for certification. The court ordered that its August 10, 2017 decision was a final appealable order with no just reason for delay.

## II. Assignments of Error

{¶ 39} Plaintiffs assign the following errors for our review on appeal:

Assignment of Error I (Count III) – The Trial Court Erred By Granting Defendants' Motion for Summary Judgment As to Count III, Breach of Fiduciary Duty Regarding The Real Estate Partnership, Because The Evidence Shows That Defendants Reduced Rents to "Net Zero" Resulting In a Transfer of Wealth From The Real Estate Partnership to the Medical Corporation. Defendants Also Sought to Sell the Olentangy River Road and Westerville Properties Well Below Their 2013 Valuations and Negotiated a Side Deal to Benefit the Medical Corporation.

Assignment of Error II (Count II) – The Trial Court Erred In Ruling That There Was No Issue Of Fact Regarding Whether There Was An Agreement To Purchase Plaintiffs' Partnership Interest In The Real Estate Partnership.

Assignment of Error III – Count VIII – The Trial Court Erred by Entering Summary Judgment on Plaintiffs' Spoliation Claim (Count VIII) Because Plaintiffs Have Produced Evidence on Each of The Elements of Spoliation Under Ohio Law.

Assignment of Error IV (Counts V, VI, and VII) – The Trial Court Erred By Granting Defendants' Motion for Summary Judgment On Plaintiffs' Meaningful Use Counts.

Assignment of Error V – The Trial Court Erred In Denying Plaintiffs' Motion to Compel Defendants to Produce Relevant and Discoverable Email From Their Personal Email Accounts.

{¶ 40} Defendants cross-appeal, assigning the following error for our review:

The Trial Court erred in entering its Decision and Entry Granting Plaintiffs' Motion for Certification Filed August 25,

2017 ("Civ.R. 54(B) Entry"), which certified the Trial Court's Decision and Entry as to Outstanding Motions for Summary Judgment as "a final appealable order with no just reason for delay" pursuant to Rule 54(B) of the Ohio Rules of Civil Procedure.

## III. Trial Court Properly Granted Plaintiffs' Motion for Civ.R. 54(B) Certification

{¶ 41} In their sole assignment of error on cross-appeal, defendants assert that the trial court erred in certifying its summary judgment decision as a final appealable order with no just reason for delay.

{¶ 42} Section 3(B)(2), Article IV of the Ohio Constitution limits an appellate court's jurisdiction to the review of final orders of lower courts. An appellate court must dismiss an appeal taken from an order that is not final and appealable. *Farmers Mkt. Drive-In Shopping Ctrs., Inc. v. Magana*, 10th Dist. No. 06AP-532, 2007-Ohio-2653, ¶ 10, citing *Renner's Welding & Fabrication, Inc. v. Chrysler Motor Corp.*, 117 Ohio App.3d 61, 64 (4th Dist.1996).

{¶ 43} The Supreme Court of Ohio has set forth a two-step analysis for determining whether an order is final and appealable. *Gen. Acc. Ins. Co. v. Ins. Co. of N. Am.*, 44 Ohio St.3d 17, 21 (1989). First, the appellate court must determine whether the order constitutes a final order as defined by R.C. 2505.02. *Id.* If the order is final under R.C. 2505.02, the court must determine whether Civ.R. 54(B) language is required. *Id.*

{¶ 44} R.C. 2505.02(B) defines a final order in pertinent part as "[a]n order that affects a substantial right in an action that in effect determines the action and prevents judgment." R.C. 2505.02(B)(1). A substantial right is a legal right that is entitled to enforcement and protection by law. *Browder v. Shea*, 10th Dist. No. 04AP-1217, 2005-Ohio-4782, ¶ 13. For an order to determine the action and prevent a judgment for the appealing party, it must dispose of the whole merits of the cause or some separate and distinct branch thereof and leave nothing for the determination of the court. *Natl. City Community Capital Corp. v. AAAA At Your Serv., Inc.*, 114 Ohio St.3d 82, 2007-Ohio-2942, ¶ 7; *Noble v. Colwell*, 44 Ohio St.3d 92, 94 (1989).

{¶ 45} Civ.R. 54(B) provides as follows:

> When more than one claim for relief is presented in an action whether as a claim, counterclaim, cross-claim, or third-party claim, and whether arising out of the same or separate transactions, or when multiple parties are involved, the court may enter final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay. In the absence of a determination that there is no just reason for delay, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties, shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

{¶ 46} Where, as here, an order adjudicates fewer than all claims in a case, it must meet the requirements of both R.C. 2505.02(B) and Civ.R. 54(B) to be final and appealable. *Noble* at syllabus. The Civ.R. 54(B) no just reason for delay language "is not a mystical incantation which transforms a nonfinal order into a final appealable order." *Wisintainer v. Elcen Power Strut Co.*, 67 Ohio St.3d 352, 354 (1993), citing *Chef Italiano Corp. v. Kent State Univ.*, 44 Ohio St.3d 86 (1989). Such language may, however, "transform a final order into a final appealable order." *Id.*

{¶ 47} "For purposes of Civ.R. 54(B) certification, in deciding that there is no just reason for delay, the trial judge makes what is essentially a factual determination – whether an interlocutory appeal is consistent with the interests of sound judicial administration." *Wisintainer* at paragraph one of the syllabus. The trial court's determination "is entitled to the same presumption of correctness that [the trial court] is accorded regarding other factual findings. An appellate court should not substitute its judgment for that of the trial court where some competent and credible evidence supports the trial court's factual findings." *Id.* at 355, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984). Thus, where the record indicates that the "interests of sound judicial administration could be served by a finding of 'no just reason for delay,' the trial court's certification determination must stand." *Id.*

{¶ 48} A trial court is not required to give reasons for its decision to add Civ.R. 54(B) language to an interlocutory order, so long as the record supports adding the language. *Dywidag Sys. Internatl., USA v. Ohio Dept. of Transp.*, 10th Dist. No. 10AP-270, 2010-Ohio-3211, ¶ 29, citing *Shore v. Consol. Rail Corp.*, 6th Dist. No. 90-OT-019 (June 21, 1991). "However, the presumption of correctness that normally attaches to the trial court's finding of 'no just reason for delay' for an immediate appeal does not apply where the judgment entry indicates the trial court acted reflexively and employed the language as boilerplate." *Id.*, citing *Mackey v. Pilarczyk*, 1st Dist. No. C-940845 (Sept. 27, 1995).

{¶ 49} Defendants initially assert that summary judgment rulings are not final orders. (Cross-appellant's Brief at 8.) While the denial of a motion for summary judgment generally does not constitute a final order, a court's order granting summary judgment can be a final order. *Celebrezze v. Netzley*, 51 Ohio St.3d 89, 90 (1990) (observing that while "[t]he denial of a motion for summary judgment * * * generally does not constitute a final order," the trial court's "grant of summary judgment in favor of defendants * * * 'determine[d] the action' as to these parties, and was thus a final order pursuant to R.C. 2505.02"). *Accord Wisintainer* at 355; *Finneran v. McNamara*, 10th Dist. No. 94APE05-651 (Dec. 22, 1994); *K.B. v. Columbus*, 10th Dist. No. 14AP-315, 2014-Ohio-4027, ¶ 12.

{¶ 50} Defendants further contend that the court's summary judgment ruling was not a final order because the "operative facts giving rise to the disposed of claims involve the same facts and conduct at issue in the pending claims." (Cross-appellants' Brief at 16.) "Two legal theories that require proof of substantially different facts are considered separate claims for purposes of Civ.R. 54(B)." *State ex rel. Wright v. Ohio Adult Parole Auth.*, 75 Ohio St.3d 82, 86 (1996). Thus, "[i]f claims are factually separate and independent, multiple claims are clearly present." *Id.*, citing 10 Wright, Miller & Kane, Federal Practice and Procedure (2dEd.1983) 63, Section 2657. *Accord Ferraro v. B.F. Goodrich Co.*, 149 Ohio App.3d 301, 2002-Ohio-4398, ¶ 18 (9th Dist.) (finding the order dismissing the appellant's age discrimination and wrongful discharge claims to be final, as the pending "breach of contract claim require[d] proof of different facts, involve[d] separate legal issues, and provide[d] for different relief than Appellant's age discrimination and wrongful discharge claims"). Civ.R. 54(B) expressly applies to claims that arise out of the same transaction.

{¶ 51} Plaintiffs raised separate claims for Civ.R. 54(B) purposes. Plaintiffs' claim for breach of fiduciary duty in the medical corporation pertained to the medical corporation's vote to change the pain procedure suite compensation structure, while plaintiffs' claim for breach of fiduciary duty in the real estate partnership concerned the real estate partnership's decision to lower the rents on the buildings to benefit the medical corporation and devalue plaintiffs' interests in the real estate partnership. (Am. Compl. at ¶ 74, 82.) Thus, plaintiffs' claims for breach of fiduciary duty concerned separate entities and were based on separate facts. Plaintiffs' remaining claims for breach of the PPIA, spoliation of evidence regarding Dr. Berasi's destruction of the PPIA, and breach of contract, conversion, and unjust enrichment relating to the meaningful use funds all required proof of substantially different facts than any pending claim.

{¶ 52} The trial court's order granting defendants' motion for summary judgment on the claims at issue in the present appeal affected a substantial right, as it determined the action and prevented plaintiffs from obtaining a judgment against defendants. The summary judgment ruling completely resolved the claims at issue. Accordingly, the court's order granting defendants' motion for summary judgment was a final order.

{¶ 53} We must next determine whether the trial court properly certified its summary judgment decision with the no just reason for delay language. The trial court's summary judgment ruling disposed of plaintiffs' claims involving the real estate partnership. The possibility of a second, subsequent trial involving only plaintiffs' claims against the real estate partnership, and not the claims against the medical corporation, demonstrates that judicial economy could be served by an immediate appeal of the court's summary judgment ruling. *See Wisintainer* at 355 (holding that "[m]ore important than the avoidance of piecemeal appeals is the avoidance of piecemeal trials" as it "conserves expense for the parties and clarifies liability issues for jurors when cases are tried without 'empty chairs' ").

{¶ 54} Moreover, the trial court did not act reflexively, but made the Civ.R. 54(B) determination after plaintiffs filed a motion seeking certification. Because the interests of sound judicial administration could be served by a finding of no just reason for delay in the present case, the trial court's certification must stand. *Wisintainer* at 355. The order at issue was both final and appealable.

{¶ 55} Defendants' sole assignment of error on cross-appeal is overruled.

## IV. Standard of Review

{¶ 56} Appellate review of summary judgment motions is de novo. *Helton v. Scioto Cty. Bd. of Commrs.*, 123 Ohio App.3d 158, 162 (4th Dist.1997). "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Banc Corp.*, 122 Ohio App.3d 100, 103 (12th Dist.1997). We must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds. *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist.1995).

{¶ 57} Summary judgment is proper only when the party moving for summary judgment demonstrates that: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in that party's favor. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 58} When seeking summary judgment on grounds that the non-moving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the non-moving party's claims. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the non-moving party has no evidence to prove its case. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the non-moving party has no evidence to support its claims. *Id.* If the moving party meets its burden, then the non-moving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial. Civ.R. 56(E); *Dresher* at 293. If the non-moving party does not so respond, summary judgment, if appropriate, shall be entered against the non-moving party. *Id.*

## V.   Genuine Issues of Material Fact Exist Regarding Plaintiffs' Claim For Breach of Fiduciary Duty In The Real Estate Partnership

{¶ 59} Plaintiffs' first assignment of error asserts that the trial court erred in granting defendants' motion for summary judgment on plaintiffs' claim for breach of fiduciary duty in the real estate partnership. The trial court stated that plaintiffs' breach of fiduciary duty in the real estate partnership claim was "in regards to the purchase of Plaintiffs' interests in the Real Estate Partnership." (Aug. 10, 2017 Decision & Entry at 5.) As such, the court granted defendants' motion for summary judgment because it concluded that there was "no valid enforceable contract between the parties for the purchase of Plaintiffs' interests in the Real Estate Partnership," and because it found no evidence "to show that Defendants breached any duty owed to Plaintiffs in regards to the Real Estate Partnership." (Aug. 10, 2017 Decision & Entry at 5-6.)

{¶ 60} The trial court did not address defendants' contention that plaintiffs' breach of fiduciary duty in the real estate partnership claim was subject to arbitration. Defendants, however, never filed a motion to stay the case pending arbitration, and instead filed responsive pleadings and a motion for summary judgment. *See Minkin v. Ohio State Home Servs., Inc.,* 10th Dist. No. 16AP-178, 2016-Ohio-5804, ¶ 16-17, quoting *Mills v. Jaguar-Cleveland Motors, Inc.*, 69 Ohio App.2d 111, 113 (8th Dist.1980) (holding that the "right to arbitrate may be waived," and that the " '[f]ailure to move for a stay, coupled with responsive pleadings, will constitute a defendant's waiver' "); *Griffth v. Linton*, 130 Ohio App.3d 746, 753 (10th Dist.1998) (observing that the "[f]iling a motion for summary judgment is inconsistent with the right to arbitrate").

{¶ 61} Plaintiffs assert that defendants breached their fiduciary duty to plaintiffs in the real estate partnership by reducing the rent the real estate partnership charged the medical corporation, and by attempting to sell the partnership property. Plaintiffs claim for breach of fiduciary duty in the real estate partnership was not based on defendants' failure to purchase plaintiffs' partnership interests.

{¶ 62} To establish a claim for breach of fiduciary duty under Ohio law, a plaintiff must demonstrate the existence of a duty arising from a fiduciary relationship, a failure to observe the duty, and an injury resulting proximately therefrom. *Saxe v. Dlusky*, 10th Dist. No. 09AP-673, 2010-Ohio-5323, ¶ 23. " 'A "fiduciary relationship" is one in which special

confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.' " *Stone v. Davis*, 66 Ohio St.2d 74, 78 (1981), quoting *In re Termination of Emp. of Pratt*, 40 Ohio St.2d 107, 115 (1974).

{¶ 63} Partners in a partnership owe a fiduciary duty to one another. *Dunn v. Zimmerman*, 69 Ohio St.3d 304, 306 (1994), citing *Arpadi v. First Msp Corp.*, 68 Ohio St.3d 453 (1994), at paragraph two of the syllabus. "The duty is one of 'utmost good faith and loyalty.' " *Saxe* at ¶ 26, quoting *DiPasquale v. Costas*, 186 Ohio App.3d 121, 2010-Ohio-832, ¶ 133 (2d Dist.). *Accord Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 130-31 (9th Dist.1989), quoting 68 Corpus Juris Secundum (1988) 516-17, Partnership, Section 76 (observing that members of a partnership have the " 'obligation of the utmost good faith in their dealings with one another with respect to partnership affairs, of acting for the common benefit of all the partners in all transactions relating to the firm business, and of refraining from taking any advantage of one another' "). *See also Crosby v. Beam*, 47 Ohio St.3d 105, 107-09 (1989). Furthermore, actions permissible under a partnership agreement may constitute a "breach of fiduciary duty when they are not taken in good faith and for legitimate business purposes." *Schafer v. RMS Realty*, 138 Ohio App.3d 244, 273 (2d Dist.2000).

{¶ 64} The real estate partnership generated income by renting the buildings it owned to the medical corporation. The real estate partnership had been a profitable enterprise over the years, and made yearly cash distributions to the partners. (Simek Dep. at 71; Kerr Dep. at 36; Otis Dep. at 191; Yu Dep. at 173; Sybert Dep. at 103; Masciola Dep. at 68.)

{¶ 65} By March 31, 2014, defendants were on notice that at least Dr. Yu intended to revert to employed-physician status. (Yu Dep. Ex. 16.) Historically, whenever a shareholder left the medical corporation, they were also bought out from their interest in the real estate partnership. (Apr. 18, 2016 Berasi Dep. at 227.)

{¶ 66} On April 18, 2014, Masciola emailed an Equity representative, Paul Heiserman, to ask for an "analysis" of the "Westerville and Olentangy River Road offices to

see if we are charging ourselves fair market value rent?"[3] (Masciola Dep. Ex. 19.) Heiserman responded to Masciola on April 29, 2014 stating, "[s]ee attached, we can modify as needed." (Masciola Dep. Ex. 19.) Attached to the email was a document entitled "Opinions of Rent," in which Equity opined that a fair rent for Olentangy was $22 to $23 per square foot and that a fair rent for Westerville was $20 to $21 per square foot. (Masciola Dep. Ex. 19.)

{¶ 67} At a June 17, 2014 finance committee meeting, the finance committee reviewed Equity's analysis of rents and concluded that the "current leases [were] significantly above fair market value." (M. Gittins Dep. Ex. 14.) The June 17, 2014 finance committee minutes state that, at "a previous Finance Committee meeting, Plante Moran recommended changing from a triple net lease to a gross lease for a more favorable tax treatment." (M. Gittins Dep. Ex. 14.) The minutes indicated that the lease adjustments would be voted on by the real estate partnership.

{¶ 68} Dr. Otis stated that the real estate partnership meeting where the vote to change the rents occurred "was not announced," and occurred at "a finance meeting" which Dr. Otis just happened to be attending. (Otis Dep. at 87.) Although Plante Moran gave a presentation at the real estate partnership meeting regarding the rents, Dr. Otis explained that Plante Moran's presentation was solely "based on requests from what Dr. Berasi wanted." (Otis Dep. at 89.) Dr. Otis stated that Plante Moran did not provide "a specific reasoning" to support "their recommendations" to change the rents. (Otis Dep. at 89-90.)

{¶ 69} In the summer of 2014, Dr. Berasi directed Steffen to calculate a rent at which the real estate partnership would have "zero profits." (Steffen Dep. at 155.) On June 19, 2014, Steffen sent Dr. Berasi an email stating that he had "calculated that a rate of $24.50 per sq ft for each of the three facilities will be a zero net income point for the next six month period." (Masciola Dep. Ex. 24.) Dr. Berasi responded to Steffen on June 29, 2014, stating that the "goal [was] to set our rent at a zero net income basis moving forward, and not just the next 6 months." (Masciola Dep. Ex. 24.) Steffen stated that they settled on $24 a square foot for the rent, which was incorporated into the leases in July 2014. (Steffen Dep. 157-58.)

---

[3] Prior to the lease changes, the rent at Olentangy was $44 per square foot and the rent at Westerville was $40 per square foot. (June 23, 2017 Berasi Dep. Ex. 28.)

{¶ 70} When the real estate partnership changed the leases for the buildings effective July 1, 2014, the lease terms were not set to expire until May 13, 2015. (Sybert Dep. Exs 12 & 13; June 23, 2017 Berasi Dep. at 131.) After the change to the leases, the real estate partnership did not make any more distributions to the partners. (Otis Dep. at 193.) Dr. Yu asserted that "the rent structure" for the buildings "was changed for the purpose of doing damage to" the value of plaintiffs' partnership interests, "[b]ecause the value of the property [was] less if the renters were paying less." (Yu Dep. at 192.)

{¶ 71} On August 22, 2014, Dr. Berasi sent Steffen an email asking, "[h]ow much money do we [the medical corporation] save each month from having lowered our rent beginning in july 1?" (Steffen Dep. Ex. 22.) Steffen informed Dr. Berasi that the medical corporation had reduced its monthly payment to the real estate partnership by $83,000, resulting in yearly savings to the medical corporation of just under $1 million. (Steffen Dep. at 162, Ex. 22.)

{¶ 72} Defendants contend that they did not breach any fiduciary duty to plaintiffs because they relied on advice from Equity, Daimler, and Plante Moran to support their decision to change the leases. Defendants state that there can be no breach of fiduciary duty "when an entity modifies a rent structure based upon advice from an independent expert." (Appellees' Brief at 17.)

{¶ 73} However, Masciola stated that the entire discussion regarding changing the rents on the buildings "was related to the PM&R docs buyout, absolutely." (Masciola Dep. at 187.) Specifically regarding Equity, Masciola affirmed that the "genesis of involving Equity was to reduce the buyout that [real estate partnership] would have to pay to the doctors." (Masciola Dep. at 53.)

{¶ 74} Equity was a co-owner of MOB2 along with several of the individual defendants and the real estate partnership, and Equity later entered into a contract to purchase the Olentangy and Westerville buildings from the real estate partnership. An Equity representative stated in a July 8, 2014 email to Masciola that, while "low rents benefit practice but create lower pricing," higher "rents create higher sales price." (Masciola Dep. Ex. 25.) Thus, it was to Equity's benefit as a potential purchaser of the properties to have the rents lowered. Plaintiffs presented the testimony of Samuel Horner, a licensed real estate appraiser, who testified that Equity was a brokerage company, "not appraisers."

(Horner Dep. at 14, 38.) Horner noted that "Equity buying the building, Equity giving an opinion of value, it just -- there's too many interrelated people involved in this thing. I would not -- I wouldn't give much credence to it." (Horner Dep. at 39.)

{¶ 75} Dr. Berasi specifically instructed Masciola to reach out to Plante Moran for suggestions on how to improve the medical corporation's position in the real estate partnership buy-out. Masciola affirmed that Dr. Berasi's request for suggestions on how to improve the medical corporation's position "was his method of asking whether * * * Plante Moran had suggestions for how to lower the buyout of the PM&R physicians." (Masciola Dep. at 42.) Steffen explained that there were only two ways to decrease the equity per partner in the real estate partnership that did not "offset" each other: either "[i]ncrease number of partners or reduce[] valuations of the assets." (Steffen Dep. Ex. 17.)

{¶ 76} Dr. Otis stated that Plante Moran's presentation at the real estate partnership meeting was devoid of any specific reasoning and was instead based solely on what Dr. Berasi wanted Plante Moran to say. While the finance committee minutes state that Plante Moran recommended changing the leases for a more favorable tax treatment, the record fails to demonstrate whether Plante Moran's tax advice was directed toward the medical corporation or the real estate partnership.

{¶ 77} Daimler provided defendants with a property analysis on October 23, 2015, detailing Daimler's opinion of the overall value of the Olentangy and Westerville properties. (Horner Dep. Ex. 1) The Daimler property analysis does not contain any opinion regarding the rents on the properties and was not created until 2015.

{¶ 78} Viewing such evidence in a light most favorable to plaintiffs, reasonable minds could conclude that defendants did not change the medical corporation's lease rates for legitimate business purposes. Indeed, Masciola testified that the genesis for contacting Equity was to reduce the plaintiffs' partnership buy-out price, and Dr. Berasi specifically instructed Masciola to reach out to Plante Moran for advice on how to reduce the plaintiffs' partnership buy-out price. While defendants assert that they altered the rents to be consistent with fair market value lease rates, issues regarding the fair market value of property are generally questions of fact to be resolved by the trier of fact. *Mechwart v. Mechwart*, 10th Dist. No. 93AP-92 (Sept. 23, 1993) (holding that "[q]uestions of fair

market value of real property are questions of fact to be determined by the trier of fact upon a proper record").

{¶ 79} When Dr. Berasi instructed Steffen to calculate a rent for the buildings that would result in no net income to the real estate partnership, plaintiffs remained as partners in the real estate partnership but were no longer shareholders in the medical corporation. The change to the rents benefited the individual defendants who remained as shareholders in the medical corporation, as it saved the medical corporation nearly $1 million a year in rental expenses. In contrast, the change to the rents rendered the once profitable real estate partnership a profitless entity. The decision by the individual defendants to benefit their separate interest in the medical corporation at the expense of the real estate partnership could convince reasonable minds that defendants breached their fiduciary duty to plaintiffs. *Compare Tinter v. Lucik*, 172 Ohio App.3d 692, 2007-Ohio-4437, ¶ 25 (8th Dist.) (observing that "the evidence was sufficient such that reasonable minds could find that Lucik breached her fiduciary duty to Tinter by * * * * engag[ing] in activities that promoted only her interests in the Berea store, of which she was sole owner, to the detriment of the Valley store, which she co-owned with Tinter"). Furthermore, testimony indicated that lower rents on the properties would decrease the value of the buildings, which in turn would decrease the value of plaintiffs' interest in the real estate partnership.

{¶ 80} Accordingly, the record presents genuine issues of material fact regarding whether defendants failed to observe their fiduciary duty by not acting with the utmost good faith and loyalty toward plaintiffs. As such, the trial court erred in granting defendants' motion for summary judgment on plaintiffs' claim for breach of fiduciary duty in the real estate partnership based on the change to the rents.

{¶ 81} Regarding the sale of the properties, the record demonstrates that the real estate partnership entered into a purchase contract with an Equity affiliated entity in February 2017 to sell both the Olentangy and Westerville properties. (June 23, 2017 Berasi Dep. at 133, Ex. 29.) The purchase prices for the buildings identified in the contract, $1,115,000 for Westerville and $2,784,000 for Olentangy, were well below Horner's

appraised values for the buildings.[4] A sale of partnership property at below fair market value may demonstrate a breach of fiduciary duties. *See Thomas v. Shaevitz*, 10th Dist. No. 98AP-1370 (Sept. 16, 1999).

{¶ 82} However, there is no indication in the record that the properties have actually sold pursuant to the purchase contract. Dr. M. Gittins testified at his March 2017 deposition that the real estate partnership still owned both the Olentangy and Westerville properties. (M. Gittins Dep. at 19-20.) At his June 2017 deposition Dr. Berasi stated that the contract for the sale of the properties had not closed, as there were "contingencies that [the parties] were working through." (June 23, 2017 Berasi Dep. at 132.)

{¶ 83} Accordingly, as the record demonstrates that the properties have not been sold, plaintiffs have not yet suffered damages necessary to support a breach of fiduciary duty claim. *Compare Werthmann v. DONet., Inc.*, 2d Dist. No. 20814, 2005-Ohio-3185, ¶ 4 (noting that "to the extent that Werthmann relie[d] on the proposition that a sale for less than share value [was] a breach of fiduciary duty, * * * no sale [had] occurred," so even if "the offer was insufficient, Werthmann still retain[ed] his stock and ha[d] not yet suffered a loss"). The trial court did not err in granting defendants' motion for summary judgment on plaintiffs' claim for breach of fiduciary duty in the real estate partnership based on the sale of the properties.

{¶ 84} Based on the foregoing, plaintiffs' first assignment of error is sustained in part and overruled in part.

## VI. The PPIA Was Not An Enforceable Contract

{¶ 85} Appellants' second assignment of error asserts that the trial court erred in holding that the PPIA was not an enforceable contract.

{¶ 86} To recover on a claim for breach of contract, a plaintiff must demonstrate the existence of a contract, plaintiff's performance of the contract, defendant's breach of the contract, and plaintiff's loss or damage as a result of defendant's breach. *Barlay v. Yoga's Drive-Thru*, 10th Dist. No. 03AP-545, 2003-Ohio-7164, ¶ 6; *Thyssen Krupp Elevator Corp. v. Constr. Plus, Inc.*, 10th Dist. No. 09AP-788, 2010-Ohio-1649, ¶ 13. "The intent of the

---

[4] Horner appraised the properties at $3,590,000 for Olentangy and $2,850,000 for Westerville as of May 1, 2014, and testified that both properties had appreciated in value since 2014 (Pls.' Memo. in Opp. to Defs.' Mot. for Summ. Jgmt., Ex. Q, Kitte Aff., Exs. 5 & 6; Horner Dep. at 50.)

parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus.

{¶ 87} Generally, a contract is defined as a promise, or a set of promises, actionable upon breach. *You v. Northeast Ohio Med. Univ.*, 10th Dist. No. 17AP-426, 2018-Ohio-4838, ¶ 19. The elements of a contract include an offer, acceptance, contractual capacity, consideration in the form of bargained for benefit or detriment, a manifestation of mutual assent, and legality of purpose. *Id.*, citing *Mulvey v. GuideOne Mut. Ins. Co.*, 10th Dist. No. 17AP-47, 2017-Ohio-7902, ¶ 13. " 'To prove the existence of a contract, a plaintiff must show that both parties consented to the terms of the contract, that there was a "meeting of the minds" of both parties.' " *Barlay* at ¶ 6, quoting *Nilavar v. Osborn*, 137 Ohio App.3d 469, 483 (2d Dist.2000), quoting *McSweeney v. Jackson*, 117 Ohio App.3d 623, 631 (4th Dist.1996). *Accord Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, ¶ 16.

{¶ 88} "Generally speaking, a contracting party's signature manifests the party's intent to be bound to a contract's terms." *Bank of New York Mellon v. Rhiel*, 155 Ohio St.3d 558, 2018-Ohio-5087, ¶ 21, citing *Preferred Capital, Inc. v. Power Eng. Group, Inc.*, 112 Ohio St.3d 429, 2007-Ohio-257, ¶ 10. "[C]ourts will give effect to the manifest intent of the parties where there is clear evidence demonstrating that the parties did not intend to be bound by the terms of an agreement until formalized in a written document and signed by both." *Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.*, 54 Ohio St.2d 147, 151 (1978).

{¶ 89} The PPIA states that it is an agreement between Drs. Simek, Otis, and Yu as the sellers, and Drs. Berasi, M. Gittins, Mavian, Sybert, Cannone, Todd, Stutzman, J. Gittins, Taylor, Rohl, Chen, Nowinski, and Mathis as the purchasers. The agreement provides that each seller shall sell "all of their interests in the Partnership by selling one thirteenth (1/13) of the partnership interest owned by each Seller (approximately four hundred and fifty-two thousandths [0.452] units) in the Partnership to each of the Purchasers effective May 1, 2014." (Am. Compl., Ex. H, PPIA (hereafter, "PPIA"), Section 1.) The PPIA contained signature blocks for each plaintiff to sign as a seller and for each individual defendant to sign as a purchaser. Each parties name was printed underneath their designated signature block.

{¶ 90} Plaintiffs assert that the medical corporation's controller's testimony demonstrates that the real estate partnership was the actual party purchasing plaintiffs' partnership interests. The controller testified that when a partner was bought out of their interest in the real estate partnership, the funds for the buy-out "came out of the [partnership]. There's no change or exchange with the individuals." (Steffen Dep. at 150.) The controller explained that the entry appeared as "[a] debit to [the exiting partner's] capital account" on the real estate partnership's books, noting that by "debiting the capital, you're decreasing their ownership." (Steffen Dep. at 121-22.)

{¶ 91} Although the real estate partnership may have facilitated the buy-out by debiting the withdrawing partner's capital account, the terms of the PPIA demonstrate that each individual defendant was the party purchasing the withdrawing partner's interest. Notably, the PPIA specified that plaintiffs would remain "financially obligated pursuant to the terms of the 2013 Purchase Agreement," regarding the 2013 partnership buy-outs, and could choose to "have that financial obligation set off against the purchase price owed to them * * * or to pay such obligation directly to the parties to whom they are financially obligated." (PPIA, Section 5.) Thus, the PPIA demonstrated that each individual defendant would incur a personal financial obligation by agreeing to purchase 0.452 units of partnership interest from plaintiffs. As such, each individual defendant had the right to choose whether to incur that personal financial obligation.[5]

{¶ 92} Plaintiffs assert that their signatures on the PPIA constituted an acceptance of the terms of the PPIA, and rendered the agreement a binding contract. Although defendants drafted the PPIA and presented it to plaintiffs, defendants drafted the document to specifically include signature blocks for each plaintiff and each individual defendant to sign. As such, the PPIA demonstrates that it was the intent of the parties that the PPIA would not become a binding agreement until it was signed by each party identified in the agreement. *See Robertson v. Rossing*, 12th Dist. No. CA98-02-035 (Feb. 8, 1999)

---

[5] The Partnership Agreement provided that, in the event a partner withdrew from the partnership, the remaining partners could choose to either all purchase the withdrawing partner's interest proportionately, or, if less than all of the partners elected to purchase the withdrawing partner's interest, "then those partners so electing [could] purchase the interest proportionately." (Partnership Agreement, Section 17(a).) If none of the remaining partners chose to purchase the withdrawing partner's interest, the withdrawing partner could "sell [their] interest to any other person or entity." (Partnership Agreement, Section 17(a).)

(concluding that, although the offeree signed the instrument and the offeror failed to sign the instrument, as the "offeror drafted the instrument to specifically include signature lines for all parties," the "signatures of all parties were necessary to create a binding contract").

{¶ 93} When plaintiffs signed the PPIA, the individual defendants' signature blocks were blank. (Simek Dep. at 21, 83; Otis Dep. at 99.) Plaintiffs testified that, after they signed the PPIA, Masciola took the PPIA to begin obtaining signatures from the other individual defendants on the document. (Simek Dep. at 85; Otis Dep. at 103; Yu Dep. at 167.) Dr. Simek noted that he "would assume that they [i.e. the individual defendants] would all have to sign it" for the PPIA to be enforceable. (Simek Dep. at 87.) Thus, plaintiffs understood that the PPIA had to be signed by all parties before it would become an enforceable agreement. *See Greeno v. Bd. of Trustees*, 10th Dist. No. 88AP-906 (Mar. 28, 1989) (finding that, as the appellant "testified that he knew of the necessity of reaching a signed agreement," the appellant "could not reasonably assume that the agreements had actually been entered into until the official agreement had, in fact, been signed by himself and representatives of Bowling Green").

{¶ 94} Although Masciola informed the plaintiffs that Dr. Berasi had signed the PPIA, there is no evidence indicating that all of the individual defendants ever signed the PPIA. (Simek Dep. at 85-86; Otis Dep. at 102-03; Yu Dep. at 167; Masciola Dep. at 183.) Accordingly, as each individual defendant did not manifest their mutual assent to the terms of the PPIA, the PPIA did not become an enforceable contract.

{¶ 95} Plaintiffs alternatively assert that Dr. Berasi's signature alone was sufficient to render the PPIA a binding contract, because Dr. Berasi signed the agreement "with the apparent authority to bind the Real Estate Partnership and the Individual Defendants." (Appellants' Brief at 39.) The real estate partnership, however, was not a party to the PPIA. As such, plaintiffs' agency argument contends that Dr. Berasi acted with apparent authority to bind each individual defendant to the PPIA.

{¶ 96} To establish an agency relationship based on apparent authority, the evidence must affirmatively demonstrate the following: (1) the alleged principal held the alleged agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) the person dealing with the agent knew of the facts and acting in good faith had reason to

believe and did believe that the agent possessed the necessary authority. *Dickinson v. Charter Oaks Tree & Landscaping Co., Inc.*, 10th Dist. No. 02AP-981, 2003-Ohio-2055, ¶ 5, citing *Master Consolidated Corp. v. BancOhio Natl. Bank*, 61 Ohio St.3d 570 (1991), syllabus. "Simply stated, there is a 'holding out' of the agent as such to the public by the principal and a reliance on that holding out by the plaintiff." *Shaffer v. Maier*, 68 Ohio St.3d 416, 418 (1994).

{¶ 97} Although plaintiffs note that Dr. Berasi was in charge of both the 2013 and the 2014 partnership buy-outs, the record fails to demonstrate that the individual defendants held Dr. Berasi out as having authority to execute the PPIA on their behalf. Notably, each individual defendant executed the 2013 purchase of partnership interest agreement in their own name. (Sybert Dep. Ex. 4.) As plaintiffs understood that Masciola would be collecting signatures from the other individual defendants, the record fails to demonstrate that plaintiffs believed in good faith that Dr. Berasi's signature was sufficient to bind each individual defendant to the PPIA. Even Dr. Simek understood that all of the individual defendants had to sign the PPIA for the agreement to be effective. (Simek Dep. at 87.)

{¶ 98} The trial court properly granted defendants' motion for summary judgment on plaintiffs' claim for breach of the PPIA. Plaintiffs' second assignment of error is overruled.

## VII. Elements of Spoliation Claim Not Satisfied

{¶ 99} Plaintiffs' third assignment of error asserts that the trial court erred in granting defendants' motion for summary judgment on plaintiffs' claim for spoliation of evidence. To establish a claim for spoliation of evidence a plaintiff must establish the following elements: (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by the defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts. *Smith v. Howard Johnson Co., Inc.*, 67 Ohio St.3d 28, 29 (1993); *Arnold v. Columbus*, 10th Dist. No. 14AP-418, 2015-Ohio-4873, ¶ 42.

{¶ 100} While the evidence demonstrates that Dr. Berasi destroyed the partially executed PPIA, the evidence fails to otherwise support the elements of a spoliation claim.

As the PPIA never became an enforceable agreement, plaintiffs cannot establish damages resulting from its destruction. *See Heimberger v. Zeal Hotel Group Ltd.*, 10th Dist. No. 15AP-99, 2015-Ohio-3845, ¶ 38, citing *Baxter v. Sandusky Newspapers, Inc.*, 6th Dist. No. E-11-006, 2012-Ohio-1233, ¶ 44 (noting that "summary judgment against a spoliation claimant is appropriate where the evidence alleged to be willfully destroyed, altered, or concealed would not have changed the result of an unsuccessful underlying case, and no other damages are alleged"); *Bae v. Dragoo & Assocs.*, 156 Ohio App.3d 103, 2004-Ohio-544, ¶ 27 (10th Dist.); *Jeffrey Mining Prods., L.P. v. Left Fork Mining Co.*, 143 Ohio App.3d 708, 718 (8th Dist.2001).

{¶ 101} Moreover, the evidence fails to indicate that Dr. Berasi was aware of pending or probable litigation involving the plaintiffs when he destroyed the PPIA in June 2014. Plaintiffs assert that a March 19, 2014 letter between Dr. Yu's attorney and the medical corporation's attorney demonstrates that Dr. Berasi was on notice of probable litigation involving plaintiffs. However, the March 19, 2014 letter is simply a discussion between the attorneys over the upcoming March 25, 2014 vote on the pain procedure suite compensation structure. (Pls.' Memo. in Opp. to Defs.' Mot. for Summ. Jgmt., Ex. Q, Kitte Aff., Ex. 2.) Although Dr. Yu's attorney expresses a concern in the letter over the individual defendants' outside interest in NASC, there is nothing in the letter indicating that litigation involving the plaintiffs was probable. *Compare Estate of Udell v. Seeley*, 7th Dist. No. 14 MA 0157, 2016-Ohio-6974, ¶ 19-21 (finding that letters from an estate attorney to a decedent's former corporate partners requesting corporate documents and expressing "a disagreement about the expense paying arrangement" were insufficient "to establish that Appellees were aware that litigation was pending or probable") *with Arnold* at ¶ 53-54 (concluding that "the City of Columbus was on notice as early as January 11, 2005 of pending or probable litigation based on Arnold's EEOC charge of discrimination").

{¶ 102} The trial court did not err in granting defendants' motion for summary judgment on plaintiffs' claim for spoliation of evidence. Plaintiffs' third assignment of error is overruled.

## VIII. Plaintiffs Not Entitled To Meaningful Use Funds

{¶ 103} Plaintiffs' fourth assignment of error asserts that the trial court erred in granting defendants' motion for summary judgment on plaintiffs' claims for conversion,

breach of contract, and unjust enrichment regarding the meaningful use funds. Plaintiffs assert that they are each entitled to the $11,760 payment of meaningful use funds identified in Steffen's April 29, 2014 email because they completed the attestations of meaningful use.

{¶ 104} However, to be able to participate in the meaningful use program, the medical corporation had to make a large capital investment to upgrade its electronic medical record software. (M. Gittins Dep. at 198, Ex. 6.) Dr. Simek acknowledged that the capital investment made by the medical corporation to acquire "an electronic medical record service" was "substantial." (Simek Dep. at 242-43.) When the 2014 meaningful use payment came into the medical corporation, the corporation's expenditures on the software were at a point where the medical corporation was "going to have to take a loan out or put this money in. So [the medical corporation] decided to put the meaningful use money in to benefit the whole group." (M. Gittins Dep. at 198.) The finance committee voted unanimously to use the meaningful use funds to offset IT expenses. (M. Gittins Dep. Ex. 13.) The 2014 meaningful use funds were ultimately posted to other income for the corporation. (Steffen Dep. at 108.)

{¶ 105} The trial court concluded that the meaningful use funds were "earned by the Medical Corporation as a whole," and that the medical corporation was "entitled to re-invest the entire Meaningful Use Distribution back into the corporation to off-set costs associated with the implementation of technology." (Aug. 10, 2017 Decision & Entry at 6-7.) As such, the court held that plaintiffs had no right to the meaningful use funds under theories of either conversion, breach of contract, or unjust enrichment.

{¶ 106} Regarding their unjust enrichment claim, plaintiffs assert that they conferred a benefit on the medical corporation by attesting to the meaningful use benchmarks. Plaintiffs acknowledge the medical corporation's capital expenditure, but assert that defendants' retention of the meaningful use funds was unjust because plaintiffs contributed to the software expenses pursuant to "the shareholder compensation/overhead formula." (Appellants' Brief at 53.)

{¶ 107} "A claim for unjust enrichment arises not from a true contract, but from a contract implied in law, or quasi contract." *Grothaus v. Warner*, 10th Dist. No. 08AP-115, 2008-Ohio-6683, ¶ 8. The elements of an unjust enrichment claim are: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit;

and (3) retention of the benefit by defendant under circumstances where it would be unjust to do so without payment. *Saraf v. Maronda Homes, Inc.*, 10th Dist. No. 02AP-461, 2002-Ohio-6741, ¶ 10, citing *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183 (1984). In an unjust enrichment claim " '[i]t is not sufficient for the plaintiffs to show that [they have] conferred a benefit upon the [defendants]. [Plaintiffs] must go further and show that under the circumstances [they have] a superior equity so that as against [them] it would be unconscionable for the [defendants] to retain the benefit.' " *United States Health Practices v. Blake*, 10th Dist. No. 00AP-1002 (Mar. 22, 2001), quoting *Katz v. Banning*, 84 Ohio App.3d 543, 552 (10th Dist.1992).

{¶ 108} Plaintiffs fail to demonstrate a superior equity which would render it unconscionable for the medical corporation to retain the meaningful use funds. Although plaintiffs completed the attestations of meaningful use of electronic medical records, the medical corporation spent a large sum of money to acquire the software necessary to provide plaintiffs with electronic medical records. Plaintiffs' contributions to the general overhead of the medical corporation did not off-set the corporation's capital expenditure on the software upgrades.

{¶ 109} Moreover, as plaintiffs acknowledge, they contributed to the medical corporation's overhead as shareholder-physicians of the medical corporation. As shareholder-physicians, plaintiffs were subject to employment agreements which detailed the compensation they were entitled to receive from the medical corporation. "In the absence of bad faith or fraud, an equitable action for unjust enrichment will not lie when the subject of the claim is governed by an express contract." *Maghie & Savage, Inc. v. P.J. Dick, Inc.*, 10th Dist. No. 08AP-487, 2009-Ohio-2164, ¶ 33, citing *Kucan v. Gen. Am. Life Ins. Co.*, 10th Dist. No. 01AP-1099, 2002-Ohio-4290, ¶ 35.

{¶ 110} Plaintiffs' shareholder-employment agreements specified that plaintiffs' compensation from the medical corporation was "equal to the net receipts * * * of the Corporation which relate to professional services rendered by the Employee minus the charges" for overhead. (Am. Compl., Ex. B, Dr. Simek Shareholder-Employment Agreement, Section 4; Ex. D, Dr. Otis Shareholder-Employment Agreement, Section 4; Ex. N, Dr. Yu Shareholder-Employment Agreement, Section 4 (collectively, "Shareholder-Employment Agreements").) The shareholder-employment agreements provided that each

plaintiff had "assign[ed] and transfer[ed] to the Corporation all fees and other income of any nature received from any source on account of professional services [he/she] performs of any kind during the term of this Agreement." (Shareholders-Employment Agreements, Section 3.)[6]

{¶ 111} There is no indication that the meaningful use funds constituted net receipts for professional services to which plaintiffs were entitled after a deduction for overhead expenses. Notably, in 2013, the meaningful use funds were paid through the medical corporation's "payroll system" but there was "no overhead withheld." (Steffen Dep. Ex. 7.) In his April 29, 2014 email, Steffen stated that the meaningful use payments would appear "as a credit to salary as not to affect overhead allocations." (Steffen Dep. Ex. 54.)

{¶ 112} Accordingly, to the extent plaintiffs had any interest in the meaningful use funds, they had assigned those funds to the medical corporation pursuant to their shareholder-employment agreements. As plaintiffs were subject to an express contract which specified the compensation they were entitled to receive from the medical corporation, plaintiffs could not maintain a claim for unjust enrichment against the medical corporation. The trial court did not err in granting defendants' motion for summary judgment on plaintiffs' claim for unjust enrichment.

{¶ 113} A claim for conversion consists of three basic elements: (1) a defendant's exercise of dominion or control (2) over a plaintiff's property (3) in a manner inconsistent with the plaintiff's rights of ownership. *RFC Capital Corp. v. EarthLink, Inc.*, 10th Dist. No. 03AP-735, 2004-Ohio-7046, ¶ 61; *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96 (1990). Pursuant to the terms of their shareholder-employment agreements, the meaningful use funds were the medical corporation's property, not plaintiffs' property. The trial court did not err in granting defendants' motion for summary judgment on plaintiffs' claim for conversion.

---

[6] The shareholder-employment agreements also provided that the "parties agree to complete such documents and forms as required by Medicare, Medicaid, or other third party payors to allow the Corporation to receive an assignment of any payments due for professional services rendered by the Employee pursuant to the terms of this Agreement," and that the employees "shall have no ownership interest in the receivables of the Corporation at any time." (Shareholders-Employment Agreements, Section 3.) The agreement obligated plaintiffs to use their "efforts for the benefit of the Corporation by whatever activities [he/she] finds appropriate." (Shareholders-Employment Agreements, Section 3.)

{¶ 114} Finally, plaintiffs contend that they were entitled to the meaningful use funds under an implied-in-fact contract theory. " 'It is generally agreed that there can not be an express agreement and an implied contract for the same thing existing at the same time.' " *Williams v. NAACP*, 10th Dist. No. 18AP-476, 2019-Ohio-1897, ¶ 24, quoting *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335 (1954). As plaintiffs' shareholder-employment agreements detailed the compensation they were entitled to receive from the medical corporation, plaintiffs could not maintain an action for breach of an implied-in-fact contract against the medical corporation for the meaningful use funds. The trial court did not err in granting defendants' motion for summary judgment on plaintiffs' claim for breach of an implied-in-fact contract.

{¶ 115} Based on the foregoing, plaintiffs' fourth assignment of error is overruled.

## IX. No Error In Discovery Ruling

{¶ 116} Plaintiffs' fifth assignment of error asserts that the trial court erred in denying their motion to compel discovery. The court denied plaintiffs' motion to compel responsive emails from all of the individual defendants' personal email accounts, but ruled that Dr. Berasi would produce responsive emails from his personal email account. The court held that there was "a caveat" to its ruling, specifying that "[i]f after review of Carl Berasi's e-mails Plaintiffs discover that relevant e-mails may have been excluded, the Court will be happy to revisit this matter." (Aug. 19, 2016 Decision & Entry Denying Pls.' Mot. to Compel at 2.)

{¶ 117} A trial court's decision on a motion to compel discovery is within its broad discretion and will not be reversed absent an abuse of such discretion. *Deutsche Bank Natl. Trust Co. v. Doucet*, 10th Dist. No. 07AP-453, 2008-Ohio-589, ¶ 19. An abuse of discretion connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Id.*, citing *Berk v. Matthews*, 53 Ohio St.3d 161, 169 (1990).

{¶ 118} While plaintiffs argue that the trial court abused its discretion by not ordering each individual defendant to produce emails from their personal email accounts, there is nothing in the record indicating that plaintiffs renewed their motion to compel pursuant to the court's direction. We find no abuse of discretion in the trial court's ruling on plaintiffs' motion to compel discovery. *See Swiggum v. Ameritech Corp.*, 10th Dist. No.

98AP-1031 (Sept. 30, 1999) (finding no abuse of discretion in the trial court's ruling dismissing a motion to compel, as the court held that the parties could "file an appropriate motion" if they needed "the intervention of the Court in the future with regard to these matters," and "[t]he record fail[ed] to indicate that plaintiffs ever filed such a motion").

{¶ 119}  Plaintiffs' fifth assignment of error is overruled.

## X. Conclusion

{¶ 120}  Having overruled defendants' cross-assignment of error and plaintiffs' second, third, fourth, and fifth assignments of error, but having sustained in part and overruled in part plaintiffs' first assignment of error, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas and remand for proceedings consistent with this decision.

*Judgment affirmed in part and reversed in part; cause remanded.*

KLATT, P.J., and SADLER, J., concur.

_____